City of Lancaster, Borough of :
Carlisle, and Borough of Columbia, :
             Petitioners :
              :
           v. :
              :
Pennsylvania Public Utility :
Commission, : No. 251 M.D. 2019
           Respondent : Argued: December 9, 2020


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge[1]
             HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge[2]
             HONORABLE MICHAEL H. WOJCIK, Judge[3]
             HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE ELLEN CEISLER, Judge


OPINION BY
JUDGE COVEY                             FILED: October 11, 2022


Before this Court is the City of Lancaster's, the Borough of Carlisle's, and the Borough of Columbia's (collectively, Municipalities) Application for Summary Relief (Application) regarding Count II of their Petition for Review (Petition) filed in this Court's original jurisdiction. After review, this Court grants the Application.

---

[1] This case was argued before an *en banc* panel of the Court before January 3, 2022, when President Judge Emerita Leavitt became a senior judge on the Court, and before January 7, 2022, when Judge Cohn Jubelirer became President Judge.

[2] This matter was assigned to the Opinion writer on June 10, 2022.

[3] This case was argued before an *en banc* panel of the Court that included Judge Crompton. Judge Crompton's service with this Court ended on January 2, 2022, before the Court reached a decision in this matter. Accordingly, Judge Wojcik was substituted for Judge Crompton as a panel member and considered the matter as submitted on the briefs.

## Background

On April 29, 2019, the Municipalities filed the Petition challenging the validity of Section 59.18 of the Pennsylvania Public Utility Commission's (PUC) Regulations (Section 59.18), 52 Pa. Code § 59.18, which, as amended by a Final Rulemaking Order adopted on May 22, 2014 (Final Rulemaking Order), *see* Petition, Ex. G, mandates outdoor gas meter locations but permits a natural gas distribution company's (NGDC) consideration of indoor gas meter locations when a gas meter is, *inter alia*, in a building within a locally designated historic district. *See* 52 Pa. Code § 59.18(a)(1). In Count I of the Petition, the Municipalities challenged Section 59.18 on the basis that, as amended, it violated article I, section 27 of the Pennsylvania Constitution.[4] In Count II of the Petition, the Municipalities challenged Section 59.18 as an improper delegation of the PUC's authority to private parties - NGDCs.

On June 26, 2019, the PUC filed preliminary objections to both Counts of the Petition (Preliminary Objections). The Court heard oral argument on December 12, 2019. On February 21, 2020, this Court sustained the PUC's Preliminary Objection to Count I of the Petition, but overruled the PUC's Preliminary Objection to Count II. *See City of Lancaster v. Pa. Pub. Util. Comm'n* (Pa. Cmwlth. No. 251 M.D. 2019, filed Feb. 21, 2020) (February 2020 Opinion).

In its February 2020 Opinion, this Court stated relative to Count II, in relevant part:

---

[4] Article I, section 27 of the Pennsylvania Constitution states:

> The people have a right to clean air, [and] pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27.

[A]s **correctly noted** by the Municipalities in their brief [in opposition to the Preliminary Objections], [Section] 59.18(d) "**contains no procedures whatsoever with respect to the placement of meters on historic properties**. **To the contrary**, **the decision of where to place a meter on a historic property is left entirely to the discretion of the utility**." (Municipalities' Br. [in Opp'n to Prelim. Objs.] at 24.) Although . . . it is possible that the owners of the historic buildings may discuss the location of the meter with the NGDC as part of the notice process, [Section] 59.18(d) does not appear to have a formal, adjudicative process. Most notably, contrary to that argued by the PUC, there is no formal application procedure embedded within [Section] 59.18. Further, in light of the plain language of [Section] 59.18(d), an NGDC is not required to set forth the basis or reasons for its determination as to whether a meter should be located inside or outside a structure.

February 2020 Op. at 24-25 (emphasis added).

On March 27, 2020, the PUC filed its answer to the Petition. On September 6, 2020, the Municipalities filed the Application seeking summary relief as to remaining Count II.

## Discussion

Initially,

Pennsylvania Rule of Appellate Procedure 1532(b) allows the Court to enter judgment at any time after the filing of a petition for review where the applicant's right to relief is clear. P[a].R.A.P. 1532(b). Summary relief is reserved for disputes that are legal rather than factual, *Rivera v. P[a.] State Police*, 255 A.3d 677, 681 (Pa. Cmwlth. 2021), and we resolve "all doubts as to the existence of disputed material fact against the moving party." *Id.* (quoting *Marcellus Shale Coal[.] v. Dep['']t of Env['']t Prot[.]*, 216 A.3d 448, 458 (Pa. Cmwlth. 2019)). **An application for summary relief is appropriate where a party lodges a facial challenge to the constitutionality of a statute**.

3

*McLinko v. Dep't of State*, 270 A.3d 1243, 1250 (Pa. Cmwlth.), *aff'd in part*, *rev'd in part on other grounds*, 279 A.3d 539 (Pa. 2022) (footnote omitted; emphasis added). "An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute." *Jubelirer v. Rendell*, 953 A.2d 514, 521 (Pa. 2008) (quoting *Calloway v. Pa. Bd. of Prob. & Parole*, 857 A.2d 218, 220 n.3 (Pa. Cmwlth. 2004)).

The Municipalities first contend that since no material facts are in dispute, this Court may grant summary relief in a facial challenge to Section 59.18. Specifically, the Municipalities assert that "this Court need only consider the wording of Section 59.18," Municipalities Br. at 12, to determine "whether the PUC did so in a way that constitutes an improper delegation to NGDCs[, which] is the only question that remains before this Court." Municipalities Reply Br. at 4. Because the Municipalities challenge whether Section 59.18 itself is an improper delegation of authority, which raises a legal rather than factual question, the Municipalities' Application is appropriate.

The Municipalities next argue that they are entitled to judgment as a matter of law because Section 59.18 improperly delegates authority to NGDCs in contravention of article II, section 1 of the Pennsylvania Constitution, which provides: "The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, § 1. Specifically, the Municipalities contend that Section 59.18 lacks adequate standards and/or procedures to guide NGDCs in determining where to place a meter at a property located in a historic district,[5] and to prevent arbitrary NGDC decisions mandating meter relocations.

---

[5] The Municipalities assert, and it is undisputed, that they have each established historic districts pursuant to what is commonly known as the Pennsylvania Historic District Act, Act of June 13, 1961, P.L. 282, No. 167, *as amended*, 53 P.S. §§ 8001-8006, and that the Municipalities,

4

Section 59.18 provides:

(a) *General requirements for meter and regulator location.*

(1) **Unless otherwise allowed or required in this section**, **meters and regulators must be located outside** and aboveground.

(2) Except in the case of an emergency, a utility shall provide written notice to a utility customer by first class mail or by personal delivery at least 30 days prior to relocating and subsequently installing a meter or regulator outside the customer's building. . . .

(3) The written notice must inform the customer and building owner of the equipment that the utility proposes to relocate, the planned new location and how to contact the utility to provide supplemental information that the utility may not have, such as the building's historic status. The written notice must include contact information for the [PUC's] Bureau of Consumer Services.

. . . .

(5) When selecting a meter or service regulator location, a utility shall consider potential damage by outside forces.

(6) The meter location must accommodate access for meter reading, inspection, repairs, testing, changing and operation of the gas shut-off valve.

(7) When feasible and practical to do so, the meter location must accommodate the installation of the service line in a straight line perpendicular to the main.

(8) Meters and service regulators may not be installed in the following locations:

---

including their historic districts, are served by an NGDC operating pursuant to the PUC's rules and regulations.

(i) Beneath or in front of windows or other building openings that may directly obstruct emergency fire exits.

(ii) Under interior stairways.

(iii) Under exterior stairways, unless an alternate means of egress exists and the meter and service regulator are installed in a well-vented location under stairs constructed of noncombustible material.

(iv) A crawl space.

(v) Near building air intakes under local or [s]tate building codes.

(vi) In contact with soil or other potentially corrosive materials.

(9) Unless caused by a customer's or building owner's violation of applicable gas safety or tariff rules, a utility shall pay the costs of relocating a meter or regulator when the relocation is performed to meet utility or [PUC] safety requirements.

(10) Unless caused by a customer's or building owner's violation of applicable gas safety or tariff rules, a utility shall pay the cost of extending customer-owned facilities to the new meter or regulator location when the relocation is performed to meet utility or [PUC] safety requirements.

(11) A customer or building owner requesting that a meter or regulator be moved shall pay the costs associated with relocation when the meter and regulator are currently situated in a suitable location under [s]tate and [f]ederal regulations.

(12) Utilities shall address meter, regulator and service line location regulations in their tariffs.

. . . .

(d) *Inside meter locations*.

(1) **Inside meter locations shall be considered only when**:

6

(i) The service line pressure is less than 10 [pounds per square inch gauge (]psig[)].

(ii) **A meter is located in a building that meets one of the following criteria**:

(A) A building is listed in the National Register of Historic Places or the customer or building owner notifies the utility that the building is eligible to be listed in the National Register of Historic Places and the eligibility can be readily confirmed by the utility.

(B) A building is located within a historic district that is listed in the National Register of Historic Places or the customer or building owner notifies the utility that the historic district is eligible to be listed in the National Register of Historic Places and the eligibility can be readily confirmed by the utility.

(C) A building has been designated as historic under the [A]ct of June 13, 1961 (P.L. 282, No. 167[, *as amended*,]) (53 P.S. §§ 8001-[]8006), known as the Pennsylvania Historic District Act, the Pennsylvania Municipalities Planning Code ([Act of July 31, 1968, P.L. 805, *as amended*,] 53 P.S. §§ 10101-[]11202), or a municipal home rule charter.

(D) **A building is located within a locally designated historic district or is eligible for the listing**, **or a building is individually designated under a local ordinance as a historic landmark or is eligible for the listing**.

(iii) Protection from ambient temperatures is necessary to avoid meter freeze-ups.

(iv) A utility determines that a meter is subject to a high risk of vandalism based on the utility's prior experience.

(v) A utility determines that an outside meter location is neither feasible nor practical.

7

(2) Except for low pressure systems with service line pressure less than 10 psig, regulators must be located outside when a meter is located inside.

(3) Installed inside meters must be attached to an operable outside shut off valve.

(4) Meters installed within a building must be located in a ventilated place not less than 3 feet (914 millimeters) from a source of ignition or source of heat which may damage the meter.

52 Pa. Code § 59.18 (a)(1)-(3), (5)-(12), (d) (bold emphasis added).

This Court observed in its February 2020 Opinion:

[T]he Final Rulemaking Order states that "**the utility will continue to retain discretion in applying this [R]egulation**," [Petition, Ex. G, Final Rulemaking Order] at 1, admits that "**the [R]egulation does contain provisions that delegate discretion to the utility** in making a determination with respect to locating an outside meter," *id.* at 26, and confirms that "due to [a utility's] public safety obligations," "**it is necessary that** . . . **the utility be allowed to make the final decision**." *Id.*

February 2020 Op. at 26 (bold and underline emphasis added).

In *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 161 A.3d 827 (Pa. 2017), the Pennsylvania Supreme Court emphasized:

[W]hen the General Assembly empowers some other branch or body to act, our jurisprudence requires "that the basic policy choices involved in 'legislative power' actually be made by the [l]egislature as constitutionally mandated." *Tosto v. Pa. Nursing Home Loan Agency*, . . . 331 A.2d 198, 202 ([Pa.] 1975). This constraint serves two purposes. First, it ensures that duly authorized and politically responsible officials make all of the necessary policy decisions, as is their mandate per the electorate. And second, it seeks to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power.

. . . .

8

Although [the Pennsylvania] Constitution generally forbids the delegation of "legislative power," it nonetheless permits the General Assembly, in some instances, to assign the authority and discretion to execute or administer a law. *Blackwell*[ *v. State Ethics Comm'n*], 567 A.2d [630,] 637 [(Pa. 1989)]. When the General Assembly does so, the Constitution imposes two fundamental limitations. **First**, **as mentioned**, **the General Assembly must make** "**the basic policy choices**," **and second**, **the legislation must include** "**adequate standards which will guide and restrain the exercise of the delegated administrative functions**." *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, . . . 877 A.2d 383, 418 ([Pa.] 2005); *State Bd. of Chiropractic Exam'rs* [*v. Life Fellowship of Pa.*], 272 A.2d [478,] 481 [(Pa. 1971)] (quoting *Chartiers Valley Joint Sch. v. C*[*n*]*ty. Bd. of Sch. Dirs. of Allegheny C*[*n*]*ty.*, . . . 211 A.2d 487, 492-93 (Pa. 1965)).

*Id*. at 833-34 (citations omitted; emphasis added).[6]  "In determining whether adequate standards have been established, we look to the entire [statute]; 'we are not

---

[6] In *Pennsylvania AFL-CIO v. Commonwealth*, 219 A.3d 306 (Pa. Cmwlth. 2019), this Court summarized:

In *Protz* [], our Supreme Court applied these standards to conclude that Section 306(a.2) [of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, added by the Act of June 24, 1996, P.L. 350, *formerly* 77 P.S. § 511.2, repealed by the Act of October 24, 2018, P.L. 714, No. 111,] was an impermissible delegation of the General Assembly's legislative authority to the [American Medical Association (]AMA[)] because that provision did not include **any** standards or basic policy choices to restrain the AMA's **future enactment** of the [American Medical Association *Guides to the Evaluation of Permanent Impairment* (]*Guides*[)], which would **then become the law** by which [impairment rating evaluations] would be performed. *Id*. at 835-36. This left the AMA with the ability to "**revise** the *Guides* once every ten years or once every ten weeks," which "gave the AMA *de facto*, **unfettered control** over a formula that ultimately will determine whether a claimant's partial[]disability benefits will cease after 500 weeks." *Id*. at 835-36 (emphasis added). Because Section 306(a.2) [of the Act] failed to meet even the basic requirements for a permissible delegation, [our] Supreme Court did not address the question of

9

limited to the mere letter of the law, but must look to the underlying purpose of the statute and its reasonable effect.'" *Gambling Expansion Fund*, 877 A.2d at 418 (quoting *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 293 (Pa. 1975)).

The instant matter involves a Commonwealth agency's delegation of its legislatively granted authority by way of a regulation.[7] Nonetheless, this Court addressed an analogous circumstance in *City of Williamsport Bureau of Codes v. DeRaffele*, 170 A.3d 1270 (Pa. Cmwlth. 2017). The *City of Williamsport* Court explained:

> [I]n the instant matter, Williamsport would have us interpret Section 11018.13 of the Third Class City Code[8] [(11 Pa.C.S. § 11018.13) (Section 11018.13)] in a manner that would effectively grant the International Code Council unfettered authority to create a new controlling Maintenance Code for the residents of Williamsport. We

---

> whether the General Assembly's delegation to a "private entity" could ever validly occur. Although it cited precedent raising concerns about such delegations, including the lack of political accountability of a private entity, it also cited other precedent that did not rule out the constitutional propriety of those delegations.

*Id.* at 314; *see also Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1228 (Pa. Cmwlth. 2018) (wherein "[t]he General Assembly delegated authority to [a third-party trade association] without providing any of the safeguards required to conform that delegation of authority to constitutional strictures[]").

[7] In fact, long before *Protz*, this Court addressed a PUC regulation governing the use of natural gas outdoor lighting that lacked necessary standards - specifically, the applicable regulations did not define "residential customer" but deferred to the utility's own classification ("residential" versus "commercial"). This Court concluded:

> Basing such a decision solely on a utility's billing classification cannot, in our view, be proper. In effect, the [PUC] would be delegating its authority to answer certain legal questions to a public utility, thereby allowing the company sought to be regulated to assume the role of regulator. While a utility's billing classification may have some relevance in the matter, it is by no means conclusive.

*Woodland Rd. Ass'n v. Pa. Pub. Util. Comm'n*, 487 A.2d 1030, 1032 (Pa. Cmwlth. 1985).

[8] 11 Pa.C.S. §§ 10101-14702.

10

decline to do so. We acknowledge that the issue of delegation is made slightly more complicated here because the General Assembly has already delegated authority to local governments like Williamsport to enact property maintenance codes. *See* [Section 141A04(a) of the Uniform Construction Code,] 11 Pa.C.S. § 141A04(a) ("[n]otwithstanding the primacy of the Uniform Construction Code, a city may enact a property maintenance ordinance, including a standard or nationally recognized property maintenance code or a change or variation"). **Williamsport's reading of Section 11018.13, however, results in the delegation of legislative authority, originating in the General Assembly, passing through local governments, and ending in the hands of the International Code Council**. The General Assembly cannot grant local governments more authority than the General Assembly possesses. **Such a scheme is analogous to the legislative delegation that the Supreme Court addressed in *Protz* and, therefore, cannot pass constitutional muster**.

*Id*. at 1274-75 (emphasis added); *see also Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205 (Pa. Cmwlth. 2018).

Similarly, in *425 Property Association of Alpha Chi Rho, Inc. v. State College Borough Zoning Hearing Board*, 223 A.3d 300 (Pa. Cmwlth. 2019), this Court stated:

As our Supreme Court has held, *a permissible delegation of legislative authority must include concrete measures to channel the delegatee's discretion and safeguards to protect against arbitrary, ad hoc decision making, such as a requirement that the delegate[e] hold hearings, allow for public notice and comment, or explain the grounds for its decision in a reasoned opinion subject to judicial review*. [*Protz*, 161 A.3d] at 835. This Court has held that the non-delegation principle applies equally to a municipality's ability to delegate administrative functions to a third party. *See City of Williamsport . . . .*

. . . .

11

Here, like *Protz*, the [z]oning [o]rdinance unconstitutionally delegates authority to Penn State [University (Penn State)] to decide whether a property may be used as a "Fraternity House" under the [z]oning [o]rdinance. The [z]oning [o]rdinance provides that a "Fraternity House" is a student living arrangement where residents are members of a Penn State "recognized fraternity or sorority" and that "recognition shall be determined by [Penn State] **through its procedures as may be established from time to time**." [State College Borough] Zoning Ordinance, § 201 . . . (emphasis added). Similar to *Protz*, the [z]oning [o]rdinance provides none of the necessary safeguards to "guide and restrain the exercise" of the administrative functions delegated to Penn State. *Protz*, 161 A.3d at 834. Specifically, *the [z]oning [o]rdinance neither outlines the policy preferences favored by [State College] Borough with respect to fraternity recognition, nor provides standards to guide Penn State in determining its recognition of fraternities as it relates to the [z]oning [o]rdinance. Under the [z]oning [o]rdinance, Penn State has sole and unbridled discretion regarding the recognition of fraternities and may revoke recognition at will. There are also no procedural mechanisms in the [z]oning [o]rdinance to protect against Penn State exercising "administrative arbitrariness and caprice."* *Id*. at 836.

*425 Prop. Ass'n*, 223 A.3d at 313 n.9 (italic emphasis added).

This Court's reasoning expressed in *425 Property Association* was consistent with our Supreme Court's somewhat analogous decision in . . . *Gambling Expansion Fund* . . . . In *Gambling Expansion Fund*, a statutory provision gave the Pennsylvania Gaming Control Board [Gaming Board] authority to ignore local zoning ordinances in deciding where to locate slot machine casinos. The [*Gambling Expansion Fund*] Court concluded the provision constituted an unconstitutional delegation of legislative authority because it failed to impose "definite standards, policies and limitations to guide [the Gaming Board's] decision[ ]making with regard to zoning issues." *Id*. at 418. The *Gambling Expansion Fund* Court contrasted the permissible delegation of authority at issue in *William Penn Parking Garage*, . . . which assigned to courts the determination of whether a

12

tax was unreasonable. That delegation of authority was appropriately limited, in that courts must explain their decisions in reasoned opinions that are subject to precedents and to appellate review; such safeguards protect from arbitrary, *ad hoc* decisions and uncontrolled discretion. *Gambling Expansion Fund*, 877 A.2d at 418 (citing *William Penn Parking Garage*, 346 A.2d at 291-92).

*Southpointe Golf Club, Inc. v. Bd. of Supervisors of Cecil Twp.*, 250 A.3d 495, 505 (Pa. Cmwlth. 2021).

In response to the Municipalities' assertion that Section 59.18 improperly vests absolute discretion in NGDCs with respect to gas meter locations in properties in historic districts and that Section 59.18 contains no standards or procedures to curtail or affect review of that discretion, the PUC claims:

> Section 59.18 . . . **does not vest absolute discretion in NGDCs with respect to the location of natural gas meters**. Section 59.18 clearly states that an NGDC must consider the location of a natural gas meter inside a building in a historic district. If the NGDC **determines that it cannot accommodate** a natural gas meter inside the building, the aggrieved party can ultimately have the [PUC] review this determination pursuant to Section 701 of the Pennsylvania Public Utility Code [(Code)], 66 Pa.C.S. § 701, and Section 5.21 of the [PUC]'s Regulations, 52 Pa. Code § 5.21.

PUC Br. at 17-18 (emphasis added).

The PUC further rejoins:

> Section 59.18 simply directs NGDCs to consider the interior placement of natural gas meters in historic districts **and if the NGDC personnel decides it cannot safely keep a natural gas meter inside an affected building**[,] that decision is ultimately reviewable by the [PUC], based on record evidence provided by the parties to a complaint.

PUC Br. at 22 (emphasis added).

13

The PUC interprets Section 59.18 as imposing an affirmative duty on an NGDC to attempt to accommodate an indoor meter. However, Section 59.18(d)(1) provides: "Inside meter locations shall be considered only when[,]" *inter alia*, the meter is in a building in a historic district. 52 Pa. Code § 59.18(d)(1). Section 59.18 does not guide the NGDC, and certainly does not create a presumption that a meter must remain inside a building unless the NGDC "cannot accommodate" it. PUC Br. at 18.

Similarly, the PUC interprets Section 59.18 as imposing a fictional burden on the NGDCs, which in no manner is supported by the Regulation, to consider the interior placement of natural gas meters in historic districts.[9] However, Section 59.18 imposes **no** burden on the NGDC, **no** presumption of an indoor meter location, and **no** requirement that an NGDC attempt to maintain an indoor meter location unless it "cannot safely" do so.[10] PUC Br. at 22.

---

[9] Like the PUC, the Dissent interprets Section 59.18 to require that an NGDC attempt to maintain an indoor meter location in a historic building. *See City of Lancaster v. Pa. Pub. Util. Comm'n*, ___ A.3d ___ (Pa. Cmwlth. No. 251 M.D. 2019, filed Oct. 11, 2022) (McCullough, J., dissenting), slip op. at 10 ("[i]f the NGDC **determines that it cannot accommodate a natural gas meter inside the building**, an aggrieved party can ultimately have the [PUC] review this determination pursuant to [S]ection 701 of the Code and [S]ection 5.21(a) of the [PUC's] [R]egulations") (emphasis added); *see also id.*, ___A.3d at ___, dissenting slip op. at 11 ("**if the NGDC personnel decides it cannot safely keep a natural gas meter inside** an affected building, that decision is ultimately reviewable by the [PUC] based on record evidence provided by the parties to a complaint") (emphasis added); *see also id.*, ___A.3d at ___, dissenting slip op. at 17 ("[Section] 59.18 requires the NGDCs to give individualized consideration to each property, based on customer feedback (regarding preservation of historical aesthetics) and safety - *i.e.*, **place [the meter] indoors if it can be done safely**, **feasibly**[,] **and practically** . . . .") (emphasis added).

[10] Section 59.18 merely provides a customer or building owner the **opportunity** to provide information to the NGDC when notified that the NGDC intends to relocate a meter. It does not require the NGDC to actually consider such information. In fact, the assumption that an NGDC's decisions will be given "individualized consideration . . . based on customer feedback . . . and safety" *invites* an arbitrary and capricious exercise of the NGDC's delegated power. *City of Lancaster*, ___A.3d at ___, dissenting slip op. at 17. Even if, as the Dissent contends, such decisions must be made on individual considerations based on specific building characteristics, such does not eliminate the necessity for standards under which the NGDCs should exercise

14

Rather, a decision regarding whether a meter in a building located in a historic district is to be moved to an outdoor location is at the NGDC's complete discretion, with absolutely no guidance in Section 59.18 and no "safeguards to protect against arbitrary, *ad hoc* decision making[.]"[11] *425 Prop. Ass'n*, 223 A.3d at

_____

discretion "to protect against arbitrary, *ad hoc* decision making[.]" *425 Prop. Ass'n*, 223 A.3d at 313 n.9.

[11] The Dissent states:

> While it does not have specific guidelines pertaining <u>only to historic buildings</u>, [Section] 59.18 provides exactly when and how meters can safely be placed inside - <u>for historic and non-historic buildings</u>. For example, pursuant to [Section] 59.18 -
>
> - A[n] NGDC cannot install a meter inside if it cannot be attached to an operable outside shut off valve. 52 Pa. Code § 59.18(*d*)(3).
>
> - A[n] NGDC cannot place or leave a gas meter inside if the service line pressure is greater than 10 psig. 52 Pa. Code § 59.18(*d*)(1)(i).
>
> - NGDCs must make sure that the gas meter is in a well-vented area, not under a stairwell, or in a crawl space, and the placement must "accommodate access for meter reading, inspection, repairs, testing, changing and operation of the gas shut-off valve." 52 Pa. Code § 59.18(*a*)(6), (8).
>
> - Meters installed within a building must be located in a ventilated place not less than 3 feet (914 millimeters) from a source of ignition or source of heat which may damage the meter. 52 Pa. Code § 59.18(*d*)(4).
>
> These are specific guidelines that restrict the NGDCs' decision making process when "considering" whether to place a gas meter inside a property in every area, including a historic district.

*City of Lancaster*, ___A.3d at ___, dissenting slip op. at 12-13 (italics and underline emphasis added; bold emphasis omitted).

The Dissent has erroneously combined Section 59.18(a) and (d), and mischaracterized the Regulation's clear language. First, Section 59.18(a) states the general rule that all meters are to be located outside, unless this section allows otherwise. *See* 52 Pa. Code § 59.18(a)(1). It also provides that meters must be accessible and lists six locations where meters may not be installed. *See* 52 Pa. Code § 59.18(a)(6) and (8). Section 59.18(a) contains no language as to whether an

15

313 n.9.  Like the statutory section at issue in *Gambling Expansion Fund*, Section

59.18 "does not provide [NGDCs] with definite standards, policies[,] and limitations

to guide its decision[ ]making with regard to [meter locations at buildings in historic

districts]."[12]  *Gambling Expansion Fund*, 877 A.2d at 418.

existing meter in a historic building must be relocated.  Second, Section 59.18(d) is entitled "Inside meter locations" and provides that "[i]nside meter locations shall be considered only when" and lists five **independent** criteria that may **permit** a meter to be located inside a building.  52 Pa. Code § 59.18(d).  Each one of the criteria is, in and of itself, a sufficient justification for an NGDC to consider an inside meter location.

The Dissent confuses the relevant regulatory language in Section 59.18(a) governing **installation** of meters as guiding an NGDC's decision over whether an **existing meter** in a historic building must **be relocated**.  Section 59.18(a) mandates that, absent an exception (as set forth in Section 59.18(d)), a meter must be located outside.  Section 59.18(a) addresses outdoor meter **installation**, not considerations governing whether an existing meter, subject to an exception to the outdoor requirement, must be relocated.

Further, the Dissent misinterprets Section 59.18(d)(1)(i) as supporting its declaration that Section 59.18 provides "exactly when and how meters can safely be placed inside – for historic and non-historic buildings." *City of Lancaster*, ___A.3d at ___, dissenting slip op. at 12 (emphasis omitted).  Section 59.18(d)(1)(i) is one independent criterion **permitting** consideration of an indoor meter location – nonetheless, the Dissent misconstrues Section 59.18(d)(1)(i) as its converse – **prohibiting** "[a]n NGDC [from] plac[ing] or leav[ing] a gas meter inside if the service line pressure is *greater than* 10 psig." *City of Lancaster*, ___A.3d at ___, dissenting slip op. at 13 (italic emphasis added; bold emphasis omitted).  Section 59.18(d)(1)(i) does not provide "exactly when and how meters can safely be placed inside" a historic building since a meter location in a historic building is simply one of the **other** four, independent bases under Section 59.18(d)(1) for permitting a meter to remain indoors. *City of Lancaster*, ___A.3d at ___, dissenting slip op. at 12 (emphasis omitted).

The Dissent suggests that "specific guidelines that restrict the NGDCs' decision making process when 'considering' whether **to place a gas meter** inside a building[,]" *City of Lancaster*, ___A.3d at ___, dissenting slip op. at 13 (emphasis added), are "very clear and specific[,]" and govern an NGDC's decision on whether to **relocate** a historic building's **existing meter**. *Id.* at 14.  However, the Dissent also contends that "even if [the purported guidelines] were not [clear and specific], Pennsylvania's non[-]delegation doctrine 'does not require that all of the details needed to administer a law be precisely or separately enumerated in the statute.'" *Id.* (quoting *Pa. Builders Ass'n v. Dep't of Lab. & Indus.*, 4 A.3d 215, 225 (Pa. Cmwlth. 2010)).  Contrary to the Dissent's characterization, the instant matter does not involve *unclear or nonspecific* guidelines.  Simply put, there are **no** standards guiding an NGDC's decision **regarding whether to relocate a historic building's indoor meter to an outdoor location**, where Section 59.18 provides historic buildings a specific exception to the general requirement that meters must be located outside.

[12] The Dissent argues it is impossible to establish standards to guide NGDCs' decisions on historic building meter relocation.  It further claims, without citation to the Municipalities' Briefs,

16

Absent an **actual** burden and/or any "safeguards to protect against arbitrary, *ad hoc* decision making," NGDCs have free, unconstrained authority to order meter relocations in historic districts. *425 Prop. Ass'n*, 223 A.3d at 313 n.9. The delegation of such authority absent basic policy choices and adequate standards cannot be sustained. *See also Pennsylvania AFL-CIO v. Commonwealth*, 219 A.3d 306, 314 (Pa. Cmwlth. 2019) ("[A] law must include 'procedural mechanisms that serve to limit or prevent the arbitrary and capricious exercise of the delegated power.'") (quoting *Protz*, 161 A.3d at 834).

This Court finds unconvincing the PUC's assertions that the Municipalities' concerns regarding an NGDC's absolute discretion are adequately addressed by Section 59.18, by the right to PUC review permitted by Section 701 of

---

that the Municipalities complain that NGDCs' considerations do not include a historic building's aesthetics, *see City of Lancaster*, ___A.3d at ___, dissenting slip op. at 16, noting:

> It . . . becomes a question of how the [PUC] could ever enact regulations that would cover every aesthetic concern in and of itself. Due to NGDCs' public safety obligations and the fact that it is impossible for the [PUC] to envision every individual circumstance, . . . it is necessary that the utilities be allowed to make the final decision as to whether a meter should be located inside or outside a structure in a historic district on a case-by-case basis to ensure the safety of the public and its personnel.

*City of Lancaster*, ___A.3d at ___, dissenting slip op. at 16-17. This Court cannot identify any statement in the Municipalities' Brief or Reply Brief specifically raising an NGDC's failure to consider aesthetics. Whether an NGDC should make the final decision on meter location is a separate question from whether the PUC was required to have included standards and guidelines in Section 59.18 to prevent the NGDCs' "arbitrary, *ad hoc* decision making[.]" *425 Prop. Ass'n*, 223 A.3d at 313 n.9.

17

the Code,[13] and by Section 5.21(a) of the PUC's Regulations,[14] as informed by Section 1501 of the Code, 66 Pa.C.S. § 1501.

In its February 2020 Opinion, this Court observed:

> Although . . . it is possible that the owners of the historic buildings may discuss the location of the meter with the NGDC as part of the notice process, [Section ]59.18(d) does not appear to have a formal, adjudicative process. Most notably, contrary to that argued by the PUC, there is no formal application procedure embedded within [Section ]59.18. Further, in light of the plain language of [Section ]59.18(d), an NGDC is not required to set forth the basis or reasons for its determination as to whether a meter should be located inside or outside a structure.

February 2020 Op. at 25.

The PUC reasons that Sections 701 and 1501 of the Code, and Section 5.21 of the PUC's Regulations, provide an adequate review process. Notably, Section 701 of the Code permits any person, corporation, or municipal corporation

---

[13] 66 Pa.C.S. § 701. Section 701 of the Code provides, in relevant part:

> The [PUC], or any person, corporation, or municipal corporation having an interest in the subject matter, . . . may complain in writing, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the [PUC] has jurisdiction to administer, or of any regulation or order of the [PUC]. Any public utility, or other person, or corporation likewise may complain of any regulation or order of the [PUC], which the complainant is or has been required by the [PUC] to observe or carry into effect.

*Id.*

[14] 52 Pa. Code § 5.21(a). Section 5.21(a) of the PUC's Regulations states:

> A person complaining of an act done or omitted to be done by a person subject to the jurisdiction of the [PUC], in violation, or claimed violation of a statute which the [PUC] has jurisdiction to administer, or of a regulation or order of the [PUC], may file a formal complaint with the [PUC].

*Id.*

18

to challenge a public utility's actions. Similarly, Section 5.21(a) of the PUC's Regulations permits a complainant to file a formal complaint with the PUC objecting to violations of law by a person under the PUC's jurisdiction.[15]

To find purported standards under Section 59.18 for PUC consideration in such hearings, the PUC relies on Section 1501 of the Code, which sets forth the conditions under which a utility provides its service. Specifically, Section 1501 of the Code provides:

> Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities **as shall be necessary or proper for the accommodation**, **convenience**, **and safety of its patrons**, **employees**, **and the public**. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities **shall be in conformity with the regulations and orders of the**

---

[15] The PUC cites *Povacz v. Pennsylvania Public Utility Commission*, 241 A.3d 481 (Pa. Cmwlth. 2020) (*en banc*), *aff'd in part, rev'd in part*, ___ A.3d ___ (Pa. Nos. 34-45 MAP 2021, filed Aug. 16, 2022), to support its assertion that the PUC "has . . . authority . . . over the NGDCs that are placing natural gas meters in historic districts." PUC Br. at 19. *Povacz* involved a challenge by utility customers to the PUC's denials of the customers' requests to be exempted from smart meter installation in or on their homes, based on their health concerns related to radiofrequency emissions exposure. The relevant statute mandated that an electric distribution company "shall furnish smart meter technology . . . in accordance with a depreciation schedule not to exceed 15 years." Section 2807(f)(2)(iii) of the Code, 66 Pa.C.S. § 2807(f)(2)(iii). However, that Section of the Code did not provide a review process for challenging the utility's smart meter placement. Nonetheless, this Court found a right to challenge under Sections 701, 1501, and 2205 of the Code, 66 Pa.C.S. §§ 701, 1501, 2205. The PUC claims that like the consumers in *Povacz*, "the Municipalities are entitled to contest the NGDC's decision on the placement of natural gas meters in historic districts before the [PUC] and request[] an accommodation pursuant to Sections 701, 1501[,] and 2205 of the Code." PUC Br. at 19.

In *Povacz*, there was no unlawful delegation challenge. Unfettered and unguided utility discretion was not at issue therein. The consumers did not challenge a PUC regulation but, rather, the interpretation of an Act of the General Assembly. This Court determined that the relevant statutory provision could be interpreted to address the consumers' concerns and remanded the case to the PUC to determine appropriate accommodations based on the facts before it.

[**PUC**].  Subject to the provisions of this part and the [R]egulations or orders of the [PUC], every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service.  Any public utility service being furnished or rendered by a municipal corporation beyond its corporate limits shall be subject to regulation and control by the [PUC] as to service and extensions, with the same force and in like manner as if such service were rendered by a public utility.  The [PUC] shall have sole and exclusive jurisdiction to promulgate rules and regulations for the allocation of natural or artificial gas supply by a public utility.

66 Pa.C.S. § 1501 (emphasis added).  According to the PUC, Section 1501 of the Code "provides the governing standard for all [PUC] determinations concerning the conditions under which a utility provides its service."  PUC Br. at 23.

The PUC explains:

Once before the [PUC] for review, the [PUC] reviews the NGDC's meter location decision pursuant to [S]ection 1501 of the Code . . . to determine whether the NGDC's natural gas meter location decision furnishes and maintains adequate, efficient, safe, and reasonable service and facilities that are necessary and proper for the accommodation, convenience, and safety of the NGDC's patrons, employees, and the public.

PUC Br. at 18.  However, Section 1501 of the Code's general statement simply describes a public utility's duty to the public.  It does not prescribe the manner in which an NGDC must exercise the unfettered, PUC-granted discretion regarding whether to order an existing interior gas meter in a historic district be moved to an exterior location, nor does it provide "concrete measures to channel the delegatee's discretion and safeguards to protect against arbitrary, *ad hoc* decision making[.]"[16] *425 Prop. Ass'n*, 223 A.3d at 313 n.9.

_____

[16] The PUC implies that NGDC safety obligations under Section 1501 of the Code are adequate standards under which NGDCs may render a decision regarding meter locations for buildings in historic districts.  This Court does not agree.  In *Commonwealth v. Cherney*, 312 A.2d

20

Notwithstanding a right to appeal under Sections 701 and 2205[17] of the Code, and Section 5.21(a) of the PUC's Regulations, absent any standards in Section

38 (Pa. 1973), the Pennsylvania Supreme Court reviewed a trial court's ruling holding that a statutory provision, stating in relevant part, "[t]he Secretary of Highways [(Secretary)] may, after due investigation, establish any speed limit on [s]tate highways where traffic conditions or other conditions of the highway make it safe to operate motor vehicles at the speeds other than as provided by this act[,]" was an unconstitutional delegation of legislative authority. *Id*. at 40. The Pennsylvania Supreme Court disagreed. Notably, **the *Cherney* Court based its decision**, **in part**, **on the fact that the legislature had provided sufficient guidelines which the Secretary could consult**, *i.e.*, **that** "[t]**he legislature specifically established speed limits for types of highways in given areas**." *Cherney*, 312 A.2d at 41 n.8 (emphasis added).

The *Cherney* Court explained:

> It is clear the legislature was attempting to establish a law which would provide speed limits to promote safety on the highways. There can be no other meaning intended but that the [S]ecretary must determine, on the basis of the particular characteristics of a highway and his expert knowledge in the field of transportation, whether raising a speed limit on certain highways will promote safety and advance the steady flow of traffic. Moreover, **in applying this guideline**, **the [S]ecretary need only look to [the relevant statutory provisions establishing speed limits for types of highways in given areas] to seek legislative guidance on what the legislature believes to be safe speeds in certain rural and urban areas**, **and [another subpart to that same statutory provision] provides many factors which the legislature deems of importance**. In light of the clear legislative purpose of safety, **and the factors enumerated in the other sections of the [c]ode**, there is no question in our view, that the first paragraph is a valid grant of authority.

*Id*. at 41 (emphasis added; footnotes omitted). Here, in contrast, there are no other "factors enumerated in other sections of the [Code]," *id*., or other similar provisions providing standards relevant to gas meter placement at buildings in historic districts, i.e., "concrete measures to channel the delegatee's discretion and safeguards to protect against arbitrary, *ad hoc* decision making[.]" *425 Prop. Ass'n*, 223 A.3d at 313 n.9.

[17] Section 2205 of the Code specifies, in relevant part:

**(a) Integrity of distribution system.**

> (1) Each [NGDC] shall maintain the integrity of its distribution system . . . in a manner sufficient to provide safe and reliable service to all retail gas customers connected to

59.18 for the NGDCs to follow, this Court cannot discern how the PUC is able to review an NGDC's decision regarding whether an interior gas meter in a historic building must be relocated to the exterior simply based on a public utility's general duties to the public under Section 1501 of the Code. Section 59.18 does not prescribe the manner in which an NGDC must exercise PUC-granted discretion regarding whether to order an existing interior gas meter in a historic district be relocated to an exterior location, and cannot serve as the PUC's standard to prevent "arbitrary, *ad hoc* decision making."[18]  *425 Prop. Ass'n*, 223 A.3d at 313 n.9.

---

> its system consistent with this title and the [PUC's] orders or [R]egulations.
>
> . . . .
>
> **(b) Installation and improvement of facilities.**
>
> . . . .
>
> (3) Disputes concerning facilities shall be subject to the jurisdiction of the [PUC] and may be initiated by the filing of a complaint under [S]ection 701 [of the Code] (relating to complaints) by the [PUC] or any interested party.

66 Pa.C.S. § 2205 (a)(1), (b)(3).

[18] The Municipalities aptly note in their Reply Brief:

> [The PUC] states that "the standard of review the [PUC] would apply would be made pursuant to Section 1501 of the Code . . . and the NGDC would have to provide substantial competent evidence demonstrating its rationale for why it placed the meter where it did." [PUC Brief in Opp'n to Prelim. Objs. at 21.]  However, there are no standards, period, under [Section] 59.18, Section 1501 of the . . . Code, or elsewhere in the PUC's [R]egulations, that provide any guidelines for determining where to place meters on historic properties.
>
> The PUC treats [Section] 59.18 as if it contains standards and procedures to be applied.  It does not.  The PUC argues that other sections of the . . . Code or PUC [R]egulations fill the gaps left by [Section] 59.18.  They do not.

*Id*. at 11-12 (footnotes omitted).

To the extent NGDC public safety obligations provide some minimum limitations on an NGDC's exercise of discretion under Section 59.18, there is simply no guidance therein with

Further, given "**the <u>utilit</u>[<u>ies</u>']** . . . **continue[d]** . . . **retain[ed] discretion in applying** [**Section 59.18**]," Petition, Ex. G, Title 52 Executive Summary, at 1 (emphasis added), and the PUC's declaration in the Final Rulemaking Order that "**it is necessary that** . . . **the utility be allowed to make the final decision**[,]" Petition, Ex. G, Final Rulemaking Order, at 26 (emphasis added),[19] it is unclear what standards the PUC would apply in deciding an appeal, other than deferring to the NGDC. Petition, Ex. G. Under such circumstances, an appeal to the PUC under Section 701 of the Code and Section 5.21 of the PUC's Regulations for an impartial review of an NGDC's decision would be meaningless.

## Conclusion

Accordingly, because the Municipalities' "right to judgment is clear and no material issues of fact are in dispute[,]" *Jubelirer*, 953 A.2d at 521 (quoting

---

respect to meter relocation decisions where an existing interior meter location in a historic building **is** safe and reasonable, but an NGDC intends to relocate the meter to an interior location to purportedly make it saf<u>**er**</u> or, perhaps, for an arbitrary reason, or for no reason whatsoever.

[19] Despite the PUC's declarations in the Final Rulemaking Order that "the **<u>utility</u>** will continue to **retain discretion** in applying this regulation," Petition Ex. G, Final Rulemaking Order, at 1, and "it is necessary that, due to its public safety obligations, **the utility be allowed to make the <u>final</u> decision**[,]" Petition, Ex. G, Final Rulemaking Order, at 26 (emphasis added), the PUC claims in its brief to this Court that "[t]he Code and . . . Section 59.18 have **not** delegated authority to NGDCs for the **final** say on the placement of natural gas meters in historic districts." PUC Br. at 20 (emphasis added).

Similarly, despite urging that it is necessary that an NGDC make the final decision on meter placement, *see* ___A.3d at ___, dissenting slip op. at 9, 17, 20, the Dissent inconsistently claims "[Section] 59.18 **does not** delegate authority to NGDCs for the final say on the placement of natural gas meters in historic districts. Rather, that final say is vested in the [PUC]." ___A.3d at ___, dissenting slip op. at 11 (emphasis added).

23

*Calloway*, 857 A.2d at 220 n.3), the Municipalities' Application is granted.[20]

_____
ANNE E. COVEY, Judge

---

[20] The Municipalities also urge this Court to find Section 58.21 *per se* unconstitutional since it delegates authority to private entities. In light of this Court's holding, we need not decide whether the PUC's delegation to NGDCs is *per se* unconstitutional as a delegation to private entities.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Lancaster, Borough of :
Carlisle, and Borough of Columbia, :
              Petitioners :
             :
          v. :
             :
Pennsylvania Public Utility :
Commission, : No. 251 M.D. 2019
         Respondent :

## O R D E R

AND NOW, this 11th day of October, 2022, the City of Lancaster's, the Borough of Carlisle's, and the Borough of Columbia's Application for Summary Relief is GRANTED. This Court declares that Section 59.18 of the Pennsylvania Public Utility Commission's Regulations, 52 Pa. Code § 59.18, as amended by the Final Rulemaking Order adopted on May 22, 2014, constitutes an unconstitutional delegation of legislative authority, and is unenforceable.

_____
ANNE E. COVEY, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Lancaster, Borough of          :
Carlisle, and Borough of Columbia,     :
   Petitioners           :
               : No. 251 M.D. 2019
    v.              :
               : Argued: December 9, 2020
Pennsylvania Public Utility            :
Commission,                            :
   Respondent            :


BEFORE:  HONORABLE MARY HANNAH LEAVITT, President Judge
     HONORABLE RENÉE COHN JUBELIRER, Judge
     HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE ANNE E. COVEY, Judge
     HONORABLE MICHAEL H. WOJCIK, Judge
     HONORABLE CHRISTINE FIZZANO CANNON, Judge
     HONORABLE ELLEN CEISLER, Judge


DISSENTING OPINION
BY JUDGE McCULLOUGH      FILED: October 11, 2022


   Prompted by safety concerns with gas leaks and explosions, among other things, with indoor meters, the Pennsylvania Utility Commission (Commission) amended the regulations at issue here.[1] Contrary to the thoughtful Majority, and notwithstanding that there are no specifically tailored standards for placement of meters in historic districts, *see City of Lancaster v. Pennsylvania. Public Utility Commission* (Pa. Cmwlth., No. 251 M.D. 2019, filed February 21, 2020) at 24-25, I disagree with the Majority that the Commission's regulation, 52

---

[1] *See* Building Explosion and Fire, Silver Spring, Maryland, August 10, 2016, NTSB/PAR-19/01 and NTSB letter to PHMSA Administrator dated June 10, 2019, attached as Appendix A to the Commission's brief.

Pa. Code § 59.18 (Location of Meters) (hereinafter Regulation 59.18) lacks adequate standards and/or procedures to guide natural gas distribution companies (NGDCs) in determining where to place a meter located in a historic district. The Commission's regulatory amendments necessarily emphasize safety concerns foremost, not aesthetics. However, the Commission does not preclude consideration of the placement of meters indoors due to aesthetics. In fact, it specifically provides for consideration by the NGDCs of the placement of meters inside buildings in historic districts. As safety concerns override aesthetics, the NGDCs are given the discretion as to the placement of these meters, while ultimate discretion resides with the Commission.

For the reasons that follow, I believe (1) the Commission has provided NGDCs with clear guidelines and sufficiently defined boundaries to enable the NGDCs to make an informed decision as to whether a gas meter can safely be placed indoors; and (2) the Commission actually retains **the final and absolute discretion** over a NGDC's decision in the placement of natural gas meters. Therefore, I am unable to agree that Regulation 59.18 constitutes an unlawful delegation of the Commission's administrative rulemaking authority.

**Factual and Procedural Background**[2]

Prior to its amendment, Regulation 59.18 permitted meters to be located inside a building "preferably in a dry, well-ventilated place not subject to excessive heat, and as near as possible to the point of entrance of the pipe supplying service to the building." (Final Rulemaking Order, attached to Municipalities' Petition for Review (PFR) as Exhibit "G," at 3.) **The Commission's Gas Safety Division concluded that the Commission's existing regulation was vague, inadequate, and out-of-date with respect to federal standards**. In amending Regulation 59.18, the Commission adopted the federal standards from the Pipeline and Hazardous Materials Safety Administration's (PHMSA) regulations.[3] *See* 49 C.F.R. § 192.353 (Customer meters and regulators: Location); 49 C.F.R. § 192.357 (Customer meters and regulators: Installation).

In its Final Rulemaking Order, the Commission amended Regulation 59.18 governing gas meter location, 52 Pa. Code § 59.18. **The meter location requirements of Regulation 59.18 are safety regulations imposed to reduce the**

---

[2] The City of Lancaster, Borough of Carlisle, and Borough of Columbia (collectively, Municipalities) have each established historic districts pursuant to the Historic District Act, Act of June 13, 1961, P.L. 282, *as amended*, 53 P.S. §§ 8001-06. The Municipalities have, by ordinances, established rules and regulations applicable in their historic districts. The Municipalities, including properties located in their historic districts, are served by NGDCs, operating pursuant to the rules and regulations of the Commission.

On May 22, 2014, the Commission adopted a Final Rulemaking Order, amending Regulation 59.18 after the Commission's Bureau of Transportation, Gas Safety Division, investigated the issue of gas meter placement and relocation in the context of service disputes between NGDCs and their customers.

[3] PHMSA regulations are the "minimum safety requirements for pipeline facilities and the transportation of [natural] gas . . . ." 49 C.F.R. § 192.1. States with PHMSA certifications, such as Pennsylvania, may adopt additional or more stringent safety standards for intrastate pipeline facilities when such standards are compatible with the minimum standards established by PHMSA. 49 U.S.C. § 60104(c).

**dangers from gas leaks**. Final Rulemaking Order, 44 Pa.B. 5835, 5835-36, 5838 (2014) (concluding that "[s]**pecifying mandatory requirements for meter, regulator and service line locations is necessary to protect the safety of the public**" and that "[w]hile it appears from the data that the inside meter and regulators were not always the primary factor for accidents, **locating meters and regulators inside certainly contributed to these incidents through a release of natural gas**").

Regulation 59.18(a) generally requires that gas meters be located "outside and aboveground." The PUC has set forth rules and guidelines for NGDCs to follow when installing gas meters inside and outside:

**§ 59.18. Meter, regulator and service line location**.

(a) General requirements for meter and regulator location.

(1) **Unless otherwise allowed or required in this section, meters and regulators must be located outside and aboveground**.

\* \* \* \*

(6) The **meter location must accommodate access for meter reading, inspection, repairs, testing, changing and operation of the gas shut-off valve**.

(7) When **feasible and practical to do so**, the meter location must accommodate the installation of the service line in a straight line perpendicular to the main.

(8) **Meters and service regulators may not be installed in the following locations**:

(i) Beneath or in front of windows or other building openings that may directly obstruct emergency fire exits.

(ii) **Under interior stairways**.

(iii) Under exterior stairways, unless an alternate means of egress exists and the meter and service regulator are installed in a well-vented location under stairs constructed of noncombustible material.

(iv) **A crawl space**.

52 Pa. Code § 59.18(a)(1), (6)-(8) (emphasis added). Regulation 59.18(d) also provides guidelines for **when and how gas meters can safely be placed inside**:

(1) Inside meter locations **shall be considered** only when:

(i) **The service line pressure is less than 10 psig.**

＊ ＊ ＊ ＊

(ii)(D) **A meter is located in a building . . . within a locally designated historic district or is eligible for the listing, or a building is individually designated under a local ordinance as a historic landmark or is eligible for the listing.**

(iii) Protection from ambient temperatures **is necessary** to avoid meter freeze-ups.

(iv) **A utility determines that a meter is subject to a high risk of vandalism based on the utility's prior experience**.

(v) A utility **determines that an outside meter location is neither feasible nor practical**.

(2) Except for low pressure systems with service line pressure less than 10 psig, regulators must be located outside when a meter is located inside.

(3) **Installed inside meters must be attached to an operable outside shut off valve**.

(4) **Meters installed within a building must be located in a ventilated place not less than 3 feet (914 millimeters) from a source of ignition or source of heat which may damage the meter.**

52 Pa. Code § 59.18(d)(1)-(4) (emphasis added).

The Commission, in promulgating this regulation, made clear that utilities must consider installation of gas meters indoors in historic districts but the decision whether to install a meter indoors involves an exercise of discretion by the utility, noting "**it is necessary that, due to its public safety obligations, the utility be allowed to make the final decision.**" Final Rulemaking Order, 44 Pa. B. at 5848.

Relying on *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 161 A.3d 827 (Pa. 2017), the Majority Opinion concludes that the Commission has violated the nondelegation rule by giving NGDCs unfettered discretion to apply their own standards when making that determination for historic properties under Regulation 59.18. I must respectfully disagree.

## Nondelegation Rule

Under article II, section 1 of the Pennsylvania Constitution, "[t]he legislative power of the Commonwealth shall be vested in a General Assembly." Pa. Const. art. II, §1. Therefore, "when the General Assembly empowers some other branch or body to act, our jurisprudence requires that the basic policy choices involved in 'legislative power' actually be made by the [l]egislature as constitutionally mandated." *Protz*, 161 A.3d at 833. This is to ensure that "duly authorized and politically responsible officials make all of the necessary policy

PAM - 6

decisions, as is their mandate per the electorate," and also "to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power." *Id*. Although generally forbidding the delegation of legislative power, in some instances the Pennsylvania Constitution permits the General Assembly to assign its authority and discretion to execute and administer a law, with the following limitations. First, the General Assembly must make the basic policy choices, and second, the legislation must include adequate standards to guide and restrain the exercise of the delegated administrative functions. *Id*. This means that "the law must contain some intelligible principle to which the person or body authorized to act is directed to conform." *Id*. A permissible delegation of legislative authority must include concrete measures to channel the delegatee's discretion and safeguards to protect against arbitrary, *ad hoc* decision making – such as a requirement that the delegatee hold hearings, allow for public notice and comment, or explain the grounds for its decision in a reasoned opinion subject to judicial review. *Id*. at 835.

In *Protz*, the Supreme Court addressed the constitutionality of a provision in the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710, that required physicians performing impairment rating evaluations of workers' compensation claimants to apply the methodology provided in the "most recent edition" of the American Medical Association (AMA) Guides to the Permanent Evaluation of Permanent Impairment. *Protz*, 161 A.3d at 830-31. The Supreme Court concluded that the General Assembly's delegation of authority to the AMA, a private entity, failed to provide any of the necessary safeguards. *Id*. at 835. In particular, the Court concluded that "the General Assembly did not favor any particular policies relative to the Guides' methodology for grading impairments, nor did it prescribe any standards to create

such a methodology." *Id*. Without any parameters, the AMA would be free to adopt any formula for impairment ratings and could change the formula at will, potentially with such frequency that no one could keep up with the changes, or alternatively, with such infrequency as to fall behind recent medical advances. *Id*. The Court also found that the General Assembly did not include any of the procedural mechanisms that are considered necessary to protect against "administrative arbitrariness and caprice," such as requiring the AMA to "hold hearings, accept public comments, or explain the grounds for its methodology in a reasoned opinion, which then could be subject to judicial review." *Id*. at 836. Thus, the Court concluded that the General Assembly unconstitutionally delegated lawmaking authority to the AMA. *Id*. at 838.

Unlike the Majority Opinion, I do not believe Regulation 59.18 constitutes an unconstitutional delegation of unbridled authority to NGDCs, as in *Protz*.

All NGDCs are required to furnish and maintain adequate, efficient, safe, and reasonable service and facilities that are necessary and proper for the accommodation, convenience, and safety of the NGDCs' patrons, employees, and the public. *See* Section 1501 of the Public Utility Code (Code), 66 Pa.C.S. § 1501. Regulation 59.18 requires NGDCs to consider inside placement of gas meters in historic districts. Requiring NGDCs to consider, in the first instance, whether it is safe, convenient, adequate, efficient, and reasonable to locate a meter inside in a historic district, is not an unlawful delegation of the Commission's authority.

The Commission cannot possibly decide where to place gas meters on a property-to-property basis. That decision naturally depends on the unique physical attributes of each property and the physical nature of the surroundings, which the NGDCs' personnel is in the best position to evaluate, just as it does for meters in

non-historic districts. It is the NGDCs' personnel who install, maintain, service, monitor, and read the gas meters. In view of their expert knowledge of gas distribution systems and their exclusive control over the gas meters, delegating to the NGDCs the authority to apply prudent techniques and practices at each historic property to determine if indoor meter placement is feasible or practical in view of safety concerns is not an unlawful delegation of the Commission's administrative rulemaking power. As this Court has already observed, due to its public safety obligations, it is necessary that the NGDC be allowed to make the final decision as to meter placement. *See UGI Utilities, Inc. v. City of Reading*, 179 A.3d 624, 630 (Pa. Cmwlth. 2017).

Moreover, contrary to the conclusion of the Majority Opinion, **Regulation 59.18 does not vest absolute discretion in NGDCs** with respect to the placement of natural gas meters. Regulation 59.18 clearly states that an NGDC must consider the location of a natural gas meter inside a building in a historic district. However, the Commission still retains absolute discretion over the NGDCs' decision in the placement of natural gas meters. Section 701 of the Code, 66 Pa.C.S. § 701, provides:

> The commission, or **any person,** corporation, or municipal corporation having an interest in the subject matter, or any public utility concerned, **may complain in writing, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the commission has jurisdiction to administer, or of any regulation or order of the commission**. Any public utility, or other person, or corporation likewise may complain of any regulation or order of the commission, which the complainant is or has been required by the commission to observe or carry into effect. The Commonwealth through

the Attorney General may be a complainant before the commission in any matter solely as an advocate for the Commonwealth as a consumer of public utility services. The commission may prescribe the form of complaints filed under this section.

66 Pa.C.S. § 701 (emphasis added).

Section 5.21(a) of the Commission's regulations likewise provides:

**A person** complaining of an act done or omitted to be done by a person subject to the jurisdiction of the Commission, in violation, or claimed violation of a statute which the Commission has jurisdiction to administer, or of a regulation or order of the Commission, may file a **formal complaint with the Commission.**

52 Pa. Code § 5.21(a) (emphasis added).

If the NGDC determines that it cannot accommodate a natural gas meter inside the building, an aggrieved party can ultimately have the Commission review this determination pursuant to section 701 of the Code and section 5.21(a) of the Commission's regulations, 52 Pa. Code § 5.21(a). Once before the Commission for review, the Commission reviews the NGDC's meter location decision pursuant to section 1501 of the Code, 66 Pa.C.S. § 1501, to determine whether the NGDC's natural gas meter location decision furnishes and maintains adequate, efficient, safe, and reasonable service and facilities that are necessary and proper for the accommodation, convenience, and safety of the NGDC's patrons, employees, and the public.

This complaint procedure on the placement of utility facilities was recently affirmed by this Court. In *Povacz v. Pennsylvania Public Utility Commission*, 241 A.3d (Pa. Cmwlth. 2020) (*en banc*) (affirmed in part, and reversed,

PAM - 10

in part, on other grounds), __ A.3d __ (Pa. Nos., 34-35 MAP 2021, filed August 16, 2021), consumers contested the placement of electric wireless smart meters. This Court recognized that the Commission is fully capable of accommodating consumers who do not want to accept electric wireless smart meters at their homes. This Court analyzed Act 129, 66 Pa.C.S. § 2807(f), and determined that despite its language directing the furnishing of smart meters on all residential service locations, the Commission has the authority to direct utilities to make accommodations for the substitution or relocation of wireless smart meters at residences. Although there was no language in Act 129 providing a set procedure for customers to follow to challenge placement of a wireless smart meter on their property, this Court unequivocally recognized that the Commission is authorized to direct utilities in the placement of utility facilities, specifically smart meters. Here, the Commission has the same authority, recognized in *Povacz*, over the NGDCs that are placing natural gas meters in historic districts. **Just like the consumers in *Povacz* who contested the placement of wireless smart meters on their residences, the Municipalities and individual consumers are entitled to contest the NGDCs' decision on the placement of natural gas meters in historic districts before the Commission and request an accommodation pursuant to Sections 701 and 1501 of the Code.** 66 Pa.C.S. §§ 701, 1501.

Thus, I submit that Regulation 59.18 does not delegate authority to NGDCs for the final say on the placement of natural gas meters in historic districts. Rather, that final say is vested in the Commission. Regulation 59.18 simply directs NGDCs to consider the interior placement of natural gas meters in historic districts, and if the NGDC personnel decides it cannot safely keep a natural gas meter inside an affected building, that decision is ultimately reviewable by the Commission based

on record evidence provided by the parties to a complaint. Because there is an administrative procedure under the Code and the Commission's regulations for reviewing the placement of natural gas meters by NGDCs, I would conclude that the Municipalities' argument that NGDCs have been vested with the ultimate authority over the placement of natural gas meters in historic districts is without merit.

## Regulation 59.18 Does Not Lack Adequate Standards

I further disagree with the Majority Opinion's conclusion that Regulation 59.18 is unconstitutional for lack of adequate standards to guide and restrain the NGDCs' exercise of the delegated administrative functions.

Regulation 59.18 contains sufficiently detailed rules to guide and restrain its execution by NGDCs in making the determination of whether to locate a gas meter inside as opposed to outside and vice versa.

Substantive rulemaking is a widely used administrative practice, and its use should be upheld whenever the statutory delegation can reasonably be construed to authorize it. *Tri-County Industries, Inc. v. Commonwealth of Pennsylvania*, 818 A.2d 574 (Pa. Cmwlth. 2003), *as amended*, (Feb. 12, 2003), *aff'd*, 884 A.2d 867 (Pa. 2005). Here, there is no question that in enacting section 1501 of the Code, the legislature made the basic policy choice that all NGDCs are required to furnish and maintain "adequate, efficient, safe, and reasonable service and facilities" that are necessary and proper for the accommodation, convenience, and safety of the NGDC's patrons, employees, and the public. In turn, the Commission promulgated detailed regulations consistent with that basic policy choice of upholding safety.

Most significantly, Regulation 59.18 is **not without standards and guidelines**. While it does not have specific guidelines pertaining only to historic

PAM - 12

buildings, Regulation 59.18 provides exactly **when and how** meters can safely be placed inside – for historic and non-historic buildings.  For example, pursuant to Regulation 59.18 –

>• **A NGDC cannot install a meter inside if it cannot be attached to an operable outside shut off valve.  52 Pa. Code §59.18(d)(3).**
>
>• **A NGDC cannot place or leave a gas meter inside if the service line pressure is greater than 10 psig. 52 Pa. Code §59.18(d)(1)(i).**
>
>• **NGDCs must make sure that the gas meter is in a well-vented area, not under a stairwell, or in a crawl space, and the placement must "accommodate access for meter reading, inspection, repairs, testing, changing and operation of the gas shut-off valve."  52 Pa. Code §59.18(a)(6), (8).**
>
>• **Meters installed within a building must be located in a ventilated place not less than 3 feet (914 millimeters) from a source of ignition or source of heat which may damage the meter.  52 Pa. Code §59.18(d)(4).**

These are specific guidelines that restrict the NGDCs' decision making process when "considering" whether to place a gas meter inside a building in every area, including a historic district.  As noted, those rules and guidelines govern NGDCs in carrying out their public utility functions under section 1501 of the Code, which requires all NGDCs to, among other things, furnish and maintain services and

facilities that are necessary and proper for the accommodation, convenience, and safety of the NGDCs' patrons, employees, and the public.[4]

---

[4] In footnote 11 of its Opinion, the Majority charges the Dissent with "combining" and "mischaracterizing" Regulation sections 59.18 (a) (general requirements for meter and regulator location) and 59.18(d) (inside meter locations). We have done no such thing. As explained, the Regulation sufficiently defines the restrictions under which inside meters shall be considered. If these circumstances do not exist, then the general rule of paragraph (1) of subsection (a) applies and the meter and regulator shall be located outside and above ground.

The Majority Opinion also proposes to create a distinction between the installation and relocation of a meter in a historic district - when there is none, arguing that there are no specific standards for the latter. The Regulation must be read in its entirety and when that is done properly, it is clear that it does provide sufficient guidance and direction for the location of meters – which necessarily includes both the installation and relocation of gas meters.

While complaining that there are no standards to guide NGDCs in determining whether to relocate meters outside in a historic building, the Majority has not identified **one** proposed additional standard that could be used in guiding historic building relocation determinations that are not already in place. The only considerations that could possibly govern the relocation of meters outside would necessarily focus on the potential physical harm to the building or aesthetics. However, the foremost consideration by the NGDCs is whether the meter can safely remain inside - regardless of the fact that the building may be harmed if it is relocated outside, or the potential for physical harm to the building. Safety simply cannot take a back seat to aesthetics or the desire to maintain the historic nature of a building. A gas meter cannot be **installed or remain inside** if it is unsafe to do so – even when the meter clashes aesthetically with historical nature of the building. Regulation sections 59.18(a) and (d) set forth precisely the minimum safety standards that NGDCs must consider when making the determination of whether leaving a meter inside is safe. The Majority itself cites the criteria to be used to evaluate the location of meters in historic districts as safety-driven, which is exactly the point of the Dissenting Opinion. Ironically, these are the very standards by which the NGDCs must determine, for **any** building, whether to place or relocate a meter inside. It ignores the fact it was safety concerns due to explosions and gas leaks that prompted the change in law to placement of meters outdoors in the first place. We have, in this Dissenting Opinion, clearly extrapolated from the Regulation the standards to guide the NGDC exactly when and how meters can safely be placed inside. Those guidelines and standards undoubtedly focus on safety first.

The Majority Opinion further charges the Dissent with "misinterpreting" Regulation 59.18(d)(1)(i) "as its converse." Again, that section provides: "Inside meter locations shall be considered **only when** (i) The service line pressure is less than 10 psig." Clearly, if the NGDC must consider an inside meter **only when** service line pressure **is less than** 10 psig, then the **inverse** necessarily is also true, namely, an inside meter cannot be placed inside if the service line is **greater than** 10 psig.

These standards are very clear and specific; but even if they were not, Pennsylvania's nondelegation doctrine "does not require that all of the details needed to administer a law be precisely or separately enumerated in the statute." *Pennsylvania Builders Association v. Department of Labor & Industry*, 4 A.3d 215, 225 (Pa. Cmwlth. 2010); *Matter of Revocation of Restaurant Liquor License No. R–12122*, 467 A.2d 85, 87 (Pa. Cmwlth. 1983). To constitute an adequate standard under the delegation doctrine, the standard itself need "not be definite or precise." *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 293 (Pa. 1975). Standards that control a non-legislative party's exercise of rulemaking authority must be viewed in light of the task necessary to accomplish the General Assembly's purpose. *Gilligan v. Pennsylvania Horse Racing Commission*, 422 A.2d 487 (Pa. 1980). In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), the U.S. Supreme Court noted that the degree of vagueness that is constitutionally tolerable depends in part on the nature of the enactment. In *Kissane v. Town Council of Town of McCandless* (Pa. Cmwlth., No. 314 C.D. 2015, Feb. 18, 2016) 2016 WL 640650, slip op. at *10,[5] local residents argued section 1313.06(e) of the McCandless Town Zoning Code, which provided that the Town Council "may require to approve alternative design standards for off-street parking in response to unusual conditions," was an unconstitutional delegation of legislative authority. We found that section 1313.06(e) reflected a legislatively determined policy choice to permit a reduction in parking based upon an objective showing of actual parking needs. We found the "expected parking" language in section 1313.06(e) to be an adequate standard upholding a basic policy choice by the Town

_____

[5] *See* 210 Pa. Code § 69.414(a) (an unpublished memorandum opinion, although not binding precedent, may be cited for its persuasive value in accordance with section 414(a) of this Court's Internal Operating Procedures).

PAM - 15

to permit a reduction required parking spaces based upon documented analysis of anticipated parking needs. As such, it did not constitute an unlawful delegation of legislative power.

Again, here, the Commission's primary consideration in placement of meters is the safety of the NGDC's patrons, employees and the public. In placing meters, a NGDC must furnish and maintain services and facilities that are necessary and proper for the accommodation and convenience of customers, but this must always be subject to the overarching public safety concern. These rules and guidelines governing the placement of meters apply equally to historic and non-historic buildings alike.

The impetus of Municipalities' complaint seems to be based solely upon the concern that a gas meter placed outside could be incompatible with the surrounding historic district or affect the property aesthetically. It makes no sense to place aesthetics over safety. A building that is historically accurate but unsafe seems to be theoretically counterintuitive. In any event, it cannot be said that NGDCs do not consider aesthetics, even though it is not a specific guideline listed under subsection (d)(1)(ii) regarding historic districts. *See Centre Park Historic District, Inc. v. UGI Utilities, Inc. City of Reading v. UGI Utilities, Inc*. (Public Utility Commission, C-2015-2516051, C-2016-2530475, filed October 24, 2019), 2019 WL 5592911 (holding that UGI's revised Gas Operation Manual, which contained standards including that UGI should attempt to locate meters in unobtrusive locations to avoid placing meters in front of distinguishing exterior features of historic properties, did not violate Regulation 59.18). If the customer is not satisfied with the response, he still has a right to appeal to the Commission to argue why his particular aesthetic request is feasible while still meeting the

overarching concern for the safety of the NGDCs' patrons, employees, and the public.

Moreover, the obvious difficulty, if not impossibility, is the implementation of regulations that will apply evenly to every request made by every building owner in an historic district. Aesthetics will vary from building to building and from historic district to historic district. It thus becomes a question of how the Commission could ever enact regulations that would cover every aesthetic concern in and of itself. Due to NGDCs' public safety obligations and the fact that it is impossible for the Commission to envision every individual circumstance, I submit that it is necessary that the utilities be allowed to make the final decision as to whether a meter should be located inside or outside a structure in a historic district on a case-by-case basis to ensure the safety of the public and its personnel. **In fact, in *UGI Utilities, Inc. v. City of Reading*, 179 A.3d at 629-30, a panel of this Court has already observed that, due to its public safety obligations, it is necessary that the NGDCs be allowed to make the final decision as to meter placement.**

In my view, when the Regulation is viewed as a whole, it is clear that the Commission intended NGDCs to evaluate, on a case-by-case basis, whether a meter associated with a building in a historic district should be left inside, taking into consideration the guidelines and rules that have been enunciated. The Commission cannot possibly be constitutionally required to appraise beforehand the myriad situations in which it wishes a particular meter placement policy to be applied and to formulate specific rules for each situation. NGDCs are public utilities with special expertise when it comes to locating gas meters on a property-to-property basis. Regulation 59.18 requires the NGDCs to give individualized consideration to each property, based on customer feedback (regarding preservation of historical

aesthetics) and safety – *i.e.*, place indoors if it can be done safely, feasibly and practically – given that it is the NGDCs that must access, repair, read, monitor, and maintain the meter. Regulation 59.18 contains adequate standards to guide and restrain NGDCs' exercise of the delegated function. Necessity fixes a point beyond which it is unreasonable and impracticable to compel the Commission to prescribe even more detailed rules.

The Majority Opinion does not explain, nor can I fathom, how the Commission could establish **additional** standards to any degree as being concrete - as each individual gas meter placement would have different physical and aesthetic considerations. The Majority Opinion would require standards for something that is not measurable or definable. **Again, the discretion granted in all cases, in historic and non-historic districts, is guided first and foremost by "public safety" pursuant to section 1501 of the Code. Further, Regulation 59.18 contains specific and detailed rules and guidelines that inform the NGDCs when NOT to put a meter inside and the parameters that must be followed when placing a meter inside—for example, if the inside meter cannot be attached to an operable outside shut off valve or if the service line pressure is greater than 10 psig.** 52 Pa. Code § 59.18(d)(3). **Further, the gas meter must be in a well-vented area, it cannot be under a stairwell, or in a crawl space, and it must "accommodate access for meter reading, inspection, repairs, testing, changing and operation of the gas shut-off valve."** 52 Pa. Code § 59.18(a)(6), (8). **Meters installed within a building in a historic district must be located in a ventilated place not less than 3 feet (914 millimeters) from a source of ignition or source of heat which may damage the meter.** 52 Pa. Code § 59.18(d)(4).

Requiring NGDCs to consider placing gas meters indoors if they can safely do so (by adhering to these specific rules and guidelines in Regulation 58.18) and when feasible or practicable – in a manner so that the NGDCs can reasonably and safely perform their public utility services to the public - does not constitute an unconstitutional delegation of the Commission's administrative rulemaking.

Lastly, to the extent that the Majority Opinion suggests that our prior opinion stating there are no specific additional guidelines pertaining only to historic districts in Regulation 59.18 binds our decision here, I disagree. First, a trial court exercises different types of review for preliminary objections and motions for summary judgment. "When reviewing preliminary objections the trial court looks to the pleadings, but, in considering a motion for summary judgment the trial court weighs the pleadings, depositions, answers to interrogatories, admissions and affidavits." *Herczeg v. Hampton Township Municipal Authority*, 766 A.2d 866, 870 (Pa. Super. 2001). Furthermore, a trial court may always revisit its own prior pre-trial rulings in a case without running afoul of the law of the case doctrine. *Commonwealth v. Starr*, 664 A.2d 1326, 1331 (Pa. 1995). In our February 21, 2020 decision overruling the Commission's preliminary objection to Count II (alleging improper sub-delegation), we analyzed Regulation 59.18 in terms of whether the Municipalities had exhausted their administrative remedies before seeking relief in this Court. In ruling on that issue, we were required to accept as true the well-pled facts of the Municipalities' PFR that the Commission vested absolute, unfettered, and unreviewable discretion in an NGDC when deciding whether to perform a meter relocation. (PFR, ¶¶ 23, 55.)

Furthermore, in our prior ruling, we never addressed the question posed here, which is whether detailed procedures specific to historic properties are needed

in order for the Commission's delegation of authority to be unlawful. As explained herein, although Regulation 59.18 itself contains no specific separate procedures with respect to the placement of meters on historic properties, other provisions of the Regulation do contain sufficient measures to guide the NGDCs in their decisions which apply to placement of all meters and specifically those that are considered for placement indoors pursuant to subsection (d). Moreover, discretion must be vested in the NGDCs and ultimately the Commission as safety must override aesthetics.

For example, as explained above, the NGDCs must follow specific requirements pursuant to Regulation 59.18. The NGDCs must be able to attach the inside meter to an operable outside shut off valve. The NGDCs cannot place a meter inside if the service line pressure is greater than 10 psig. The gas meter has to be in a well-vented area, it cannot be under a stairwell, or in a crawl space, and it must "accommodate access for meter reading, inspection, repairs, testing, changing and operation of the gas shut-off valve." Meters installed within a building must be located in a ventilated place not less than 3 feet (914 millimeters) from a source of ignition or source of heat which may damage the meter. Further, section 1501 of the Code requires all NGDCs to, among other things, furnish and maintain services and facilities that are necessary and proper for the accommodation, convenience, and safety of the NGDCs' patrons, employees, and the public.

Due to NGDCs' public safety obligations and the fact that it is impossible for the Commission to envision every individual circumstance regarding every building situated in the Commonwealth of Pennsylvania, it is necessary that the utilities be allowed to make the final decision as to whether a meter should be located inside or outside a historic structure on a case-by-case basis to ensure the safety of the public and their personnel, guided by the specific guidelines for

placement of all meters and those being considered for indoor placement. The Municipalities have raised no other basis on which the placement of these meters can be determined. The decision is then subject to appeal to the Commission for further review. For these reasons, I believe our two rulings are entirely consistent and not contradictory as argued by the Majority Opinion.

Based on the forgoing, I would deny the Municipalities' application for summary relief and dismiss their PFR.

_____
PATRICIA A. McCULLOUGH, Judge

President Judge Cohn Jubelirer joins in this dissenting opinion.